UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN R. NAJDL, | CASE NO. 1:21-CV-01578-SL |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | REPORT AND RECOMMENDATION |
| Defendant. | |

INTRODUCTION

Plaintiff John R. Najdl filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 13, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation. (Non-document entry of August 13, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for further proceedings consistent with this Report and Recommendation.

PROCEDURAL BACKGROUND

Mr. Najdl filed for DIB on April 9, 2020, alleging a disability onset date of February 23, 2019. (Tr. 388). His claims were denied initially and on reconsideration. (Tr. 313, 320). He then

1

requested a hearing before an Administrative Law Judge. (Tr. 338-39). Mr. Najdl (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on December 14, 2020. (Tr. 38-58). On January 19, 2021, the ALJ issued a written decision finding Mr. Najdl not disabled. (Tr. 16-30). The Appeals Council denied Mr. Najdl's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Najdl timely filed this action on August 13, 2021. (ECF #1).

### FACTUAL BACKGROUND

### I.    PERSONAL AND VOCATIONAL EVIDENCE

Mr. Najdl was 44 years old at the time of his alleged onset date, and 45 years old at the time of the administrative hearing. (Tr. 308). Mr. Najdl completed high school. (Tr. 309). In the past, Mr. Najdl has been employed as a store laborer, materials handler, grocery store clerk, and grocery bagger (Tr. 28).

### II.   RELEVANT MEDICAL EVIDENCE

Mr. Najdl received outpatient mental health services through Veterans Affairs (VA) for "difficulty organizing [his] thoughts," anxiety, and depression. (Tr. 515). On January 31, 2019, Mr. Najdl followed up with clinical social worker Mary Zoller, LISW-S, for individual counseling. (Tr. 522-23). He reported that he was medication compliant and feeling "good." (Tr. 523). He remained active with his church and spent time with his cousin watching sports. (*Id.*). On examination, Mr. Najdl was alert and attentive, cooperative and reasonable. (*Id.*). His energy level was good, speech was normal, mood was very upbeat, affect was appropriate, thought process was normal and coherent, and memory was intact. (*Id.*).

2

On February 11, 2019, Mr. Najdl followed up with psychiatrist, Anna-Lynn Tamayo-Reyes, MD, for medication management of his schizoaffective disorder. (Tr. 516). He reported that, for the most part, his mood had been good. (Tr. 517). His energy level was good, and he reported sleeping six to seven hours a night. (*Id.*). On examination, Mr. Najdl was cooperative and engaging. (Tr. 520). He reported a good mood and made appropriate eye contact. (*Id.*). Moreover, Mr. Najdl's affect was euthymic, speech and thought processes were normal, cognition was intact (he was oriented and had fair/good memory/concentration); and insight and judgment were fair. (*Id.*). Dr. Tamayo-Reyes noted that Mr. Najdl's schizoaffective disorder appeared to be stable on his medication regimen, and continued him on Aripiprazole, Trazodone "as needed" for insomnia, Bupropion XL, and Buspirone. (*Id.*). Dr. Tamayo-Reyes asked him to follow up in eight weeks. (*Id.*).

On April 11, 2019, Mr. Najdl saw Dr. Tamayo-Reyes (Tr. 502). He reported sleeping well and that his mood was really good. (*Id.*). Mr. Najdl continued to stay active in church and reported going out in the community to promote and invite people to church activities. (*Id.*). Dr. Tamayo-Reyes continued Mr. Najdl's medications and set a follow-up appointment for eight weeks (Tr. 506).

On June 11, 2019, Mr. Najdl returned to Dr. Tamayo-Reyes (Tr. 488). Again, he reported that his mood was good and he had been sleeping well. (Tr. 488). On examination, Mr. Najdl was cooperative and engaging. Mr. Najdl maintained appropriate eye contact, his affect was bright and euthymic, speech and thought processes were normal, cognition was intact, and insight and judgment were fair. (Tr. 491-92). Dr. Tamayo-Reyes noted that Mr. Najdl's schizoaffective disorder appeared to be stable on his current regimen, and continued Aripiprazole, Trazodone "as needed"

for insomnia, Bupropion XL, and Buspirone. (Tr. 492). Dr. Tamayo-Reyes asked Mr. Najdl to follow up in eight weeks. (Tr. 492).

On June 27, 2019, Mr. Najdl saw Ms. Zoller for individual counseling. (Tr. 484). He reported that he was medication compliant, feeling good, was sleeping, and had more energy. (Tr. 485). He remained active with family and his church. (*Id.*). On examination, Mr. Najdl was alert, attentive, cooperative, and reasonable. (*Id.*). His speech and thought process were normal. (*Id.*). He displayed a very upbeat mood with an appropriate affect, and his memory was intact. (*Id.*).

On October 21, 2019, Mr. Najdl reported that he was "a bit depressed" on some days, but overall, most days were okay. (Tr. 660). His sleep was fair. (*Id.*). On examination, he was cooperative and engaging. (Tr. 663). Mr. Najdl's mood and affect were euthymic, his speech and thought process were normal; cognition was intact (he was oriented and had fair/good memory/concentration); and insight and judgment were fair. (*Id.*). Dr. Tamayo-Reyes again noted that Mr. Najdl's schizoaffective disorder appeared to be stable on his current regimen and she continued his medications. (Tr. 663-64).

On February 24, 2020, Mr. Najdl followed up with Dr. Tamayo-Reyes (Tr. 575). He reported that he recently had the flu and felt a bit anxious. (*Id.*). He was still recovering from the flu, but otherwise was he overall "stable." (*Id.*). He remained active in his church and was getting to know a woman in Columbus that he met through online dating. (*Id.*). He described his sleep as fair and denied any medication side effects. (*Id.*). On examination, Mr. Najdl was cooperative and engaging. (Tr. 577). His eye contact was appropriate, mood and affect were euthymic, he smiled easily, speech and thought process were normal, cognition was intact (he was oriented and had fair/good memory/concentration), and insight and judgment were fair. (*Id.*). Dr. Tamayo-Reyes

4

noted Mr. Najdl's schizoaffective disorder appeared stable on his current regimen and continued Aripiprazole, Trazodone "as needed" for insomnia, Bupropion XL, and Buspirone. (Tr. 578). She asked him to follow up in eight weeks. (*Id.*).

On April 10, 2020, Mr. Najdl reported to Ms. Zoller that he felt he was adjusting to the COVID-19 quarantine. (Tr. 785). He said that he was staying connected by using his church's streaming services and website. (*Id.*). On examination, Mr. Najdl was alert and attentive, cooperative and reasonable, and had good energy. (*Id.*).

On April 27, 2020, Mr. Najdl had a telehealth appointment with Dr. Tamayo-Reyes due to the COVID-19 pandemic restrictions. (Tr. 779). He reported difficulty adapting to the pandemic restrictions, related isolation, and lack of outlets such as church activities/services. (*Id.*). However, he was still maintaining contact with friends and family. (*Id.*). He reported insomnia with fragmented sleep, but also reported noticing improved sleep over the prior weekend after he went out to help clean the church. (*Id.*). He reported a plan to make a new routine of doing home exercises, taking walks, and scheduling home upkeep. (*Id.*). On examination, he was cooperative and engaging. (Tr. 781). Though Mr. Najdl maintained appropriate eye contact, his mood was frustrated and affect constricted. (*Id.*). Mental status examination was otherwise normal. (*Id.*). Dr. Tamayo-Reyes diagnosed schizoaffective disorder with difficulties adjusting to restrictions of pandemic and related insomnia. (*Id.*). She increased Mr. Najdl's Trazodone "as needed" for insomnia and continued his other medications. (Tr. 782).

On May 11, 2020, Mr. Najdl had a telehealth appointment with Ms. Zoller due to COVID-19. (Tr. 629). He reported that the higher dose of Trazodone helped his sleep patterns. (Tr. 630). Mr. Najdl reported spending twelve hours at church the day before his appointment,

and noted that he was trying to stay connected with people by visiting in the driveway. (*Id.*). Mental status examination was normal. (*Id.*).

On May 28, 2020, Mr. Najdl had a telehealth appointment with Dr. Tamayo-Reyes. (Tr. 616). He continued to report improved sleep with the increased dosage of Trazadone. (Tr. 617). Mr. Najdl also reported following a routine of scheduled activities each day, such as laundry on Mondays and house cleaning on Wednesdays. (*Id.*). In addition, he reported taking walks when the weather permitted, attending peer support groups by telephone, and maintaining contact with friends and family. (*Id.*). Mental status examination was normal, and Mr. Najdl stated his mood was "better." (Tr. 618).

On July 28, 2020, Mr. Najdl had a telehealth appointment with Dr. Tamayo-Reyes. (Tr. 963). Mr. Najdl stated his mood was okay and he continued to cope. (Tr. 964). Mr. Najdl reported he would typically be depressed this time of year but his active participation in peer support groups and church help him to not get so depressed. (*Id.*). His sleep was fragmented some nights, but most nights he slept fairly. (*Id.*). In addition, Mr. Najdl reported he was swimming more, attending on-line Tai-Chi classes, and maintaining contact with friends and family. (*Id.*). On examination, he was cooperative and maintained appropriate eye contact. (Tr. 965). Mr. Najdl's mood was okay, with an appropriate affect. (Tr. 966). Otherwise, the mental status examination revealed normal findings. (*Id.*). Dr. Tamayo-Reyes noted that his schizoaffective disorder was stable and continued Aripiprazole, Trazodone "as needed" for insomnia, Bupropion XL, and Buspirone. (*Id.*).

On September 28, 2020, Mr. Najdl had a telehealth appointment with Dr. Tamayo-Reyes (Tr. 1036). He reported feeling okay and that he was "adjusting this time of the year" as usual. (Tr. 1037). Mr. Najdl explained that typically at this time of the year, he experiences a "slight dip" in

his mood and some decline in motivation to do chores, possibly due to the changing weather. (*Id.*).
He had a light box and found it useful before, and Dr. Tamayo-Reyes advised him to start using
the light box. (*Id.*). He reported that his sleep was fragmented some nights, but most nights he
sleeps fairly well. (*Id.*). Mr. Najdl continued to be involved in his church, maintained contact with
friends and family, and was compliant with medications without side effects. (*Id.*). On
examination, he was cooperative and maintained appropriate eye contact. (Tr. 1039). His mood
was "okay" with some slight depression. (*Id.*). Otherwise, the mental status examination was
normal. (*Id.*). Dr. Tamayo-Reyes continued Aripiprazole, Trazodone "as needed" for insomnia,
Melatonin, Bupropion XL, and Buspirone (Tr. 1039).

On April 26, 2019, Mr. Najdl saw respiratory therapist Camela Newsome for his
obstructive sleep apnea and "PAP machine troubleshooting." (Tr. 476). His wireless modem had
been deactivated in December 2018 for non-compliance. (Tr. 476). However, he wanted to have
his CPAP machine checked to ensure that it was still functioning properly because he planned to
resume using it. (Tr. 476-77). Ms. Newsome verified that the machine was working properly, and
she reactivated the modem. (Tr. 477). She advised Mr. Najdl to use the CPAP machine more than
four hours per night and she discussed ways to help him acclimate to the therapy. (Tr. 477). She
advised Mr. Najdl to call the clinic if he had recurring problems with sleep apnea or daytime
somnolence. (Tr. 477).

On June 11, 2019, Mr. Najdl told Dr. Tamayo-Reyes that he was still training himself to
use the CPAP machine consistently, but his sleep was good. (Tr. 488). On January 28, 2020, Mr.
Najdl's modem was deactivated again because he was not using his CPAP machine on a regular
basis, but he could schedule an appointment to reactivate it. (Tr. 810).

7

On September 14, 2020, he told Dr. Yalamanchili, his primary care physician, that he was sleeping much better with Trazodone and he had not been using his CPAP machine. (Tr. 1055). Dr. Yalamanchili encouraged Mr. Najdl to use his CPAP daily even if he felt that he was sleeping better because his sleep apnea still needed to be treated to prevent long-term side effects from chronic hypoxemia. (*Id.*).

### III.   STATE AGENCY OPINIONS

On June 29, 2020, state agency psychologist David Dietz, Ph.D, reviewed Mr. Najdl's file and adopted the prior ALJ's residual functional capacity (RFC) assessment, dated February 27, 2019, under the *Drummond* ruling. (Tr. 312). The prior ALJ determined Mr. Najdl had the residual functional capacity to perform the full range of work at all exertional levels but with non-exertional limitations:

> The claimant should avoid concentrated exposure to extreme heat and humidity. The claimant is further limited to routine tasks with no strict time demands or strict production quotas, and is limited to routine and predictable changes in the work setting. He is limited to occasional and superficial interaction with the public, coworkers, and supervisors, no fast pace production quotas. Superficial means the job cannot require arbitration, negotiation or conflict resolution, management or supervision of others, or being responsible for the health, safety or welfare of others.

(Tr. 312).

On reconsideration, Irma Johnston, Psy.D, reviewed the file and also adopted the prior ALJ's RFC assessment. (Tr. 319). Dr. Johnston based her opinion on two mental status examinations from June and July 2020 showing largely normal findings. (Tr. 316).

Both reviewing doctors determined Mr. Najdl has a mild limitation in his ability to understand, remember, or apply information, and moderate limitations in his abilities to interact

with others; concentrate, persist, or maintain pace; and adapt or management oneself. (Tr. 310, 317).

IV.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Najdl and VE Kathleen Reis, presented on December 14, 2020 during the hearing before the ALJ.

Mr. Najdl testified he is unable to work because he experiences a lot of interruptions from his illness. (Tr. 43). He is unable to sleep consistently, gets up several times during the night, and sometimes must nap during the day. (*Id.*). Mr. Najdl is unable to concentrate and focus all the time and has a challenging time following direction. (*Id.*). His mental health symptoms have gotten worse since the 2019 decision denying benefits. (Tr. 44). He is more depressed on a consistent basis, has a tough time getting out of the house and doing things because of high anxiety. (*Id.*). Sometimes, his symptoms are so bad that he struggles to do things like shop for groceries, do laundry, and clean his apartment. (*Id.*). Mr. Najdl has a tough time being around crowds, so his mother accompanies him to the grocery store (Tr. 45). His mother also provides support and motivation to complete tasks. (*Id.*).

Mr. Najdl goes to church every Wednesday and Sunday. (Tr. 47). About once a month, he volunteers to help clean and maintain the church. (*Id.*). Before the COVID-19 pandemic, Mr. Najdl also used to help transport churchgoers with special needs to the church services. (Tr. 48).

Mr. Najdl manages his mental health condition with medications, some of which cause side effects including increased nervousness, feeling tired, dry mouth, appetite increase with weight gain, restlessness, and a frequent need to use the bathroom. (Tr. 49). Mr. Najdl also receives counseling and attends peer support groups. (Tr. 50).

The VE then testified. The ALJ asked if an individual of Mr. Najdl's age, education, and work history could perform past relevant work if subject to the following limitations: should avoid concentrated exposure to extreme heat and humidity; is limited to routine tasks with no strict time demands or strict production quotas; can engage in routine and predictable changes in the work setting; is limited to occasional and superficial interaction with the public, coworkers, and supervisors (with superficial defined to be work that does not require arbitration, negotiation or conflict resolution, management or supervision of others, or being responsible for the health, safety, or welfare of others). (Tr. 52). The VE testified that such an individual would not be able to perform Mr. Najdl's past relevant work. (Tr. 53). He identified other positions such an individual could perform, including cleaner II, industrial cleaner, and linen-room attendant, all medium exertion positions. (Tr. 53).

The VE also testified that an employer will start to consider disciplinary action and termination if an employee is off-task 10% of the workday and would certainly terminate an employee who is off-task 15% of the workday. (*Id.*). An employee who is absent one day a month or less would be able to sustain employment. (Tr. 55). Lastly, the VE testified that during the probationary period an employer would tolerate an employee requiring redirection one time per hour, but after the probationary period such redirection would be "special supervision" and not sustainable. (Tr. 56-57).

V.    OTHER RELEVANT EVIDENCE

Mr. Najdl completed an Adult Function Report, dated June 9, 2020. (Tr. 422-29). Mr. Najdl asserts he cannot work on a schedule because he gets easily overwhelmed due to his anxiety, depression, insomnia, and fragmented sleep. (Tr. 422). He claims his condition affects his memory

and his abilities to communicate, complete tasks, concentrate, understand, follow instructions, and get along with others. (Tr. 427). While Mr. Najdl is able to get along with authority figures, he does not handle stress or changes in routine well. (Tr. 428). He needs help with housekeeping, motivation, and meal preparation. (Tr. 423). His mother helps him with laundry, and Mr. Najdl has a handyman to do household repairs. (Tr. 424). Mr. Najdl does not shop in stores, but does his shopping by telephone, mail, or computer. (Tr. 425). Mr. Najdl regularly goes to church, his mother's house, and support groups. (Tr. 426). He enjoys birdwatching, walking, swimming, and watching sports, but is less interested in those activities. (*Id.*). Mr. Najdl estimated he can walk one mile before needing to rest for five minutes and can pay attention for thirty minutes. (Tr. 427).

## THE ALJ'S DECISION

The ALJ's decision, dated January 19, 2021, included the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2020.

2. The claimant has not engaged in substantial gainful activity during the period from his alleged onset date of February 23, 2019 through his date last insured of September 30, 2020 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairment: schizoaffective disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of at all exertional levels but with the following nonexertional limitations: the claimant should avoid concentrated exposure to extreme heat and humidity. The claimant is limited to routine

11

tasks with no strict time demands or strict production quotas, and is limited to routine and predictable changes in a work setting. He is limited to occasional and superficial interaction with the public, coworkers, and supervisors, and no fast pace production quotas. "Superficial" means the job cannot require arbitration, negotiation or conflict resolution, management or supervision of others, or being responsible for the health, safety or welfare of others.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on January 19, 1975 and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, at any time from February 23, 2019, the alleged onset date, through September 30, 2020, the date last insured (20 CFR 404.1520(g)).

(Tr. 18-30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION[1]

Mr. Najdl alleges the ALJ applied the wrong standard of review when she considered the prior ALJ's RFC finding to be a mandatory starting point for her analysis, creating an unwarranted procedural burden in violation of the Sixth Circuit's decision in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018). (Pl.'s Br., ECF #10, PageID 1112). The Commissioner concedes the ALJ incorrectly characterized the prior RFC as "binding," but argues the ALJ properly applied the principles of *Earley*. (Comm'r's Br., ECF #11, PageID 1131). Moreover, the Commissioner asserts courts review administrative agency decisions for harmless error. (*Id.* at PageID 1129). In reply, Mr. Najdl claims the "ALJ's decision does not reflect that she provided a 'fresh look' to [Mr. Najdl's] application. Rather, the current ALJ stated she was 'bound' by the prior ALJ's findings." (*Id.* at PageID 1140).

In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d 837, 842 (6th Cir. 1997). In that case, the claimant's initial claim for SSI was denied when an ALJ found

---

[1]      The Commissioner claims Mr. Najdl has waived his argument by failing to develop it, but I find that Mr. Najdl has offered sufficiently developed argumentation. *Cf. McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

the claimant retained an RFC for sedentary work. *Id.* at 838. When the claimant later re-filed her

disability claim, a second ALJ found that the claimant retained an RFC suitable for medium-level

work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id.* at 839.

After explaining that "[r]es judicata applies in an administrative law context following a trial type

hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC

determination of the first ALJ because there was no new or additional evidence of an

improvement in the claimant's condition. *Id.* at 841-42. "Just as a social security claimant is barred

from relitigating an issue that has been previously determined, so is the Commissioner." *Id.*

In response to *Drummond*, the Social Security Administration promulgated AR 98–4(6),

which explained as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior claim, adjudicators must adopt
> such a finding from the final decision by an ALJ or the Appeals Council on the prior
> claim in determining whether the claimant is disabled with respect to the
> unadjudicated period unless there is new and material evidence relating to such a
> finding or there has been a change in the law, regulations or rulings affecting the
> finding or the method for arriving at the finding.

1998 WL 283902, at *3

The Sixth Circuit recently clarified the scope of *Drummond* in *Earley*. There, the Sixth

Circuit stated res judicata applies to subsequent applications for "the same period of time . . .

rejected by the first application." *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018).

The Sixth Circuit further reasoned:

> While we are at it, we should point out that issue preclusion, sometimes called
> collateral estoppel, rarely would apply in this setting. That doctrine "foreclos[es]
> successive litigation of an issue of fact or law actually litigated and resolved." *Id.* at
> 748-49, 121 S.Ct. 1808. But human health is rarely static. Sure as we're born, we age.
> Sometimes we become sick and sometimes we become better as time passes. Any
> earlier proceeding that found or rejected the onset of a disability could rarely, if ever,

16

have "actually litigated and resolved" whether a person was disabled at some later date.

All of this helps to explain why *Drummond* referred to "principles of res judicata" – with an accent on the word "principles." 126 F.3d at 841-843. What are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. *Id.* at 842; *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999). This is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Id.*

Some district courts have interpreted *Earley* as the Commissioner does in this case, to mean that the ALJ must simply review the evidence for the new relevant time period to see if the prior RFC must change to accommodate it. (*See* Comm'r's Br., ECF #11, PageID 1134); *Williams v. Comm'r of Soc. Sec.*, No. 3:18CV1303, 2019 WL 3356666 at *8 (N.D. Ohio July 25, 2019) ("Because it is apparent the ALJ took a fresh look at the new evidence accruing from the time-period post-dating the prior unfavorable decision, the ALJ's decision to adopt the same mental restrictions as existed in the prior RFC did not offend any of the principles set forth in *Earley*."); *Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 5118598, at *4 (E.D. Mich. Aug. 21, 2018), *report and recommendation adopted*, 2018 WL 4403418 (E.D. Mich. Sept. 17, 2018). The ALJ in this case complies with this understanding of *Earley*, by considering the new evidence with the old RFC as her starting point. (*See* Tr. 23-26).

Other district courts interpret *Earley* to mean a claimant is entitled to review absent the presumption that the prior RFC remains the correct RFC for the subsequent claim. *See, e.g.*, *Hogren v. Comm'r of Soc. Sec.*, No. 2:19-cv-854, 2020 WL 830401, at *4 (S.D. Ohio Feb. 20, 2020), *report and recommendation adopted*, 2020 WL 1140058 (S.D. Ohio Mar. 9, 2020) ("Thus,

notwithstanding the new and additional evidence before her, ALJ Southern did not simply treat ALJ Flebbe's decision as a 'legitimate, albeit not binding consideration' as *Earley* directs, but rather explicitly concluded that ALJ Flebbe's previous evaluation of Plaintiff's medical records was binding."); *Ferrell v. Berryhill*, No. 1:16-cv-00050, 2019 WL 2077501, at *5 (E.D. Tenn. May 10, 2019) ("The point of *Earley*, in this Court's opinion, is that regardless of her chances of success, an applicant should have the opportunity for a full hearing, with no presumptions applied, when the claim covers a new period of time not addressed in the prior hearing."); *Dunn v. Comm'r of Soc. Sec.*, No. 1:17-cv-634, 2018 WL 4574831, at *3 (W.D. Mich. Sept. 25, 2018) ("In performing this analysis, ALJ Jones' decision was essentially a review of ALJ Moscow Michaelson's RFC findings ... rather than a 'fresh review' of plaintiff's 'new application for a new period of time.'"); *Gale v. Comm'r of Soc. Sec.*, No. 1:18-cv-859, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019) ("In sum, *Earley* stands for the proposition that when an ALJ evaluates a subsequent application for benefits, covering a distinct period of time, the ALJ can properly consider a previous ALJ's RFC assessment and errs only when he considers the previous RFC a mandatory starting point for the analysis.") , *report and recommendation adopted*, 2020 WL 871201 (W.D. Mich. Feb. 21, 2020). As another court in this district determined, I find these courts have the better understanding of *Earley*. *See Dilauro v. Comm'r of Soc. Sec.*, No. 5:19 CV 2691, 2020 WL 9259708, *10 (N.D. Ohio Nov. 19, 2020) (Knepp, M.J.), *report and recommendation adopted*, 2020 WL 1175415 (N.D. Ohio Mar. 29, 2021).

Mr. Najdl's present claim is for February 23, 2019 (Tr. 16) though January 19, 2021. (Tr. 30). This claim is distinct from his prior claim, which was for October 6, 2016 through February 27, 2019, when the ALJ issued a written decision denying that claim. (Tr. 16; *see also Earley*, 893

F.3d at 933 ("Res judicata bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.")).

Even if little to no new evidence is presented for a second application, the prior ALJ decision does not bind the subsequent ALJ. *Earley*, 893 F.3d at 933. This case, however, has a great deal of new evidence, spanning from early 2019 through late 2020. And the ALJ considered this new evidence (Tr. 23-26), but from a starting point of evaluating whether it was compatible with the prior RFC. (Tr. 16). That violates the statutory framework governing disability claims. *Willis v. Sullivan*, 931 F.2d 390, 397 (6th Cir. 1991) ("A claimant, with each claim she brings for an unadjudicated time period, is entitled to a *de novo* review of the medical evidence.") (citing 42 U.S.C. § 405(b)). The *Earley* Court recognized nothing in the statute permits deviating from that standard when a claimant has previously been denied. *Earley*, 893 F.3d at 933 ("When an individual seeks disability benefits for a distinct period of time, each application is entitled to review. There is nothing in the relevant statutes to the contrary.").

Here, the ALJ did not give the evidence a fresh look to determine Mr. Najdl's RFC, and for that reason, the case must be remanded. Contrary to the Commissioner's contention that harmless error applies, Mr. Najdl was entitled to a *de novo* review of the medical evidence, which he has not yet received in light of the ALJ's decision to review the medical evidence only to see if it established a significant change in Mr. Najdl's condition. It is possible the ALJ will come to the same conclusion as she did in the current decision. But Mr. Najdl remains entitled to a full hearing without any additional procedural burden to overcome. *Earley*, 893 F.3d at 934 ("All roads in the end lead to this destination: The ALJ should have another opportunity to review the application under the correct standard."); *Ferrell*, 2019 WL 2077501, at *6 ("The application of the

presumption in AR 98-4(6), interpreting *Drummond*, creates an unwarranted procedural burden for claimants at the second hearing … the Court finds Plaintiff is entitled to a new hearing"). The ALJ should review Mr. Najdl's records again, but without a presumption that the prior ALJ's RFC is proper until the evidence establishes a significant change in condition.

### Conclusion and Recommendation

Following review of the arguments presented, the record, and the applicable law, I recommend the decision be **REVERSED** and **REMANDED** for further proceedings consistent with this Report and Recommendation.

Dated: July 8, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific**

objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green,* No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard,* 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).